RECEIVED
CHAMBERS OF
... CASEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

CHIEMI YORK, Individually and as
Administratrix of the Estate of KEVIN PATRICK YORK,
deceased, and on behalf of all survivors of
KEVIN PATRICK YORK,

JENNIFER TARANTINO, Individually
and as Executrix of the Estate of
KENNETH TARANTINO, deceased, and on behalf
of all survivors of KENNETH TARANTINO,

H. MICHAEL KEDEN, Individually and
as Executor of the Estate of ADAM JAY LEWIS,
deceased, and on behalf of all survivors of
ADAM JAY LEWIS,

NANCY ANN FOSTER, Individually and as
Administratrix of the Estate of NOEL JOHN FOSTER,
deceased, and on behalf of all survivors of NOEL JOHN FOSTER

Plaintiffs,

-against-

**AL QAEDA ISLAMIC ARMY;**
EGYPTIAN ISLAMIC JIHAD;
OSAMA BIN LADEN, a/k/a USAMA BIN LADEN, a/k/a ABU ABDULLAH,
a/k/a MUJAHID SHAYKH HAIJS, a/k/a ABDUL HAY;
ESTATE OF MUHAMMAD ATEF;
AYMAN AL ZAWAHIRI;
ABU ZUBAYDH;
SAIF AL ADEL;
KHALID SHEIKH MOHAMMED;
ABDULLAH AHMED ABDULLAH;
ESTATE OF ABU HAFS, a/k/a KHALED AL SHANGUITI,
a/k/a MAFUZ OULD AL WALID, a/k/a THE MAURITANIAN;
ESTATE OF ABU SALAH AL-YEMENI;
ESTATE OF ABU JAFFER AL-JAZIRI, a/k/a OMAR CHEBBANI;
MUHSIN MUSA MATWALLI ATWAY;
ANAS AL LIBY;
IBN AL-SHAYKH AL-LIBI;
FAZUL ABDULLAH MOHAMMED;

Civil Action No. 03 CV 5493

**COMPLAINT AND JURY DEMAND**

DOC # 1

AHMED MOHAMED HAMED ALI;
MOHAMED SULEIMAN AL NALFI;
MUSTAFA MOHAMED FADHIL;
AHMED KHALFAN GHAILANI;
FAHID MOHAMMED ALLY MSALAM;
SHEIKH AHMED SALIM SWEDAN;
MUHAMMAD ABU-ISLAM;
ABDULLAH QASSIM;
RAMZI BIN AL-SHIBB;
HASHIM ABDULRAHMAN;
MUSTAFA AHMED AL-HAWSAWI, a/k/a SHAYKH SAI'ID;
ABDULLAH AZZAM;
JAMAL AL-BADAWI;
MOHAMMED OMAR AL-HARAZI;
WALID AL-SOUROURI;
FATHA ADBUL RAHMAN;
YASSER AL-AZZANI;
JAMAL BAKHORSH;
AHMAD AL-SHINNI;
RAED HIJAZI;
JAMIL QASIM SAEED;
ABU ABDUL RAHMAN;
MOHAMED BAYAZID;

***(Terrorist Hijackers)***
THE ESTATE OF MARWAN ALSHEHHI;
THE ESTATE OF FAYEZ AHMED;
THE ESTATE OF AHMED AL GHAMDI;
THE ESTATE OF HAMZA AL GHAMDI;
THE ESTATE OF MOHALD AL SHEHRI;
THE ESTATE OF SATAM M. A. AL SUQAMI;
THE ESTATE OF ABDULAZIZ AL OMARI;
THE ESTATE OF WALEED M. AL SHEHRI;
THE ESTATE OF WAIL AL SHEHRI;
THE ESTATE OF MOHAMMED ATTA;
THE ESTATE OF KHALID AL MIDHAR;
THE ESTATE OF HAWAF AL HAZMI;
THE ESTATE OF HANI HANJOUR;
THE ESTATE OF SALEM AL HAZMI;
THE ESTATE OF MAJED MOQED;
THE ESTATE OF ZIAD SAMIR JARRAH;
THE ESTATE OF AHMED IBRAHIM A. AL HAZNAWI;
THE ESTATE OF SAEED AL GHAMDI;
THE ESTATE OF AHMED AL NAMI;
ZACARIAS MOUSSAOUI;

**THE TALIBAN;**
MUHAMMAD OMAR;

**THE REPUBLIC OF IRAQ;**
IRAQI INTELLIGENCE AGENCY, a/k/a THE MUKHABARAT,
a/k/a THE FEDAYEEN, a/k/a AL QARE, a/k/a UNIT 999,
a/k/a M-8 SPECIAL OPERATIONS;
SADDAM HUSSEIN;
QUSAY HUSSEIN;
UDAY HUSSEIN;
TAHA YASSIN RAMADAN;
MUHAMMED MAHDI SALAH;
FARUQ AL-HIJAZI;
SALAH SULEIMAN;
AHMED KHALIL IBRAHIM SAMIR AL-ANI;
HABIB FARIS ABDULLAH AL-MAMOURI;
ABDEL HUSSEIN, a/k/a THE GHOST;
HAQI ISMAIL;
TAHA AL ALWANI;
ABU AGAB;
ABU WA'EL;

***(Co-Conspirators)***

ADVICE AND REFORMATION COMMITTEE;
AFGHAN SUPPORT COMMITTEE (ASC);
AFRICAN MUSLIM AGENCY;
AL BARAKA INVESTMENT AND DEVELOPMENT CORPORATION,
a/k/a AL BARAKA BANK, a/k/a DALLAH ALBARAKA GROUP, LLC;
AL BARAKAAT EXCHANGE LLC, a/k/a AL-BARAKAAT BANK,
a/k/a AL-BARAKAAT GROUP;
AL-HIJRAH CONSTRUCTION & DEVELOPMENT LTD;
AL-HARAMAIN ISLAMIC FOUNDATION, INC., a/k/a AL-HARAMAIN ISLAMIC
FOUNDATION, a/k/a ISLAMIC AL-HARAMAIN;
AL HARAMAIN FOUNDATION, a/k/a AL HARAMAIN;
AL KHALEEJIA FOR EXPORT PROMOTION AND MARKETING COMPANY;
AL RAJHI BANKING AND INVESTMENT, a/k/a AL RAJHI BANK;
AL RASHID TRUST;
AL SHAMAL ISLAMIC BANK, a/k/a SHAMEL BANK, a/k/a BANK EL SHAMAR,
AL TAQWA BANK;
AL TAQWA MANAGEMENT ORGANIZATION SA;
AL TAQWA TRADE, PROPERTY AND INDUSTRY, LTD;
ARADI, INC.;
ASAT TRUST REG.;
BENEVOLENCE INTERNATIONAL FOUNDATION;
a/k/a AL BIR AL DAWALIA, a/k/a AL BIR SOCIETY ORGANIZATION;

BENEVOLENCE INTERNATIONAL FOUNDATION – USA;
BENEVOLENCE INTERNATIONAL FOUNDATION – CANADA;
FAISAL ISLAMIC BANK;
GLOBAL DIAMOND RESOURCES, INC.
GLOBAL RELIEF FOUNDATION, INC.;
GROVE CORPORATE, INC.;
HERITAGE EDUCATION TRUST;
INTERNATIONAL DEVELOPMENT FOUNDATION;
INTERNATIONAL INSTITUTE OF ISLAMIC THOUGHT;
ISLAMIC ARMY FOR THE LIBERATION OF HOLY PLACES;
ISLAMIC CULTURAL INSTITUTE OF MILAN;
INTERNATIONAL ISLAMIC RELIEF ORGANIZATION,
a/k/a ISLAMIC RELIEF ORGANIZATION,
a/k/a INTERNATIONAL RELIEF ORGANIZATION,
a/k/a SUCCESS FOUNDATION;
MAR-JAC INVESTMENTS, INC.;
MAR-JAC POULTRY, INC.;
MENA CORPORATION;
MUSLIM WORLD LEAGUE, a/k/a RABITA AL-ALAM AL-ISLAMI,
a/k/a ISLAMIC WORLD LEAGUE;
MUSLIM WORLD LEAGUE OFFICES;
MUWAFFAW FOUNDATION;
NATIONAL COMMERCIAL BANK;
NADA MANAGEMENT ORGANIZATION SA;
RABITA TRUST;
RESTON INVESTMENTS, INC.;
SAAR FOUNDATION, a/k/a SAAR NETWORK, a/k/a SAAR INTERNATIONAL;
SAFA TRUST;
SANABEL AL KHEER, INC., a/k/a THE SANA-BELL, INC.,
a/k/a SANABEL AL KHAIR, a/k/a SANABIL AL-KHAIR;
SAUDI BIN LADEN GROUP, a/k/a BIN LADEN CORPORATION;
SAUDI SUDANESE BANK;
SHAMAL ISLAMIC BANK;
SOMALI INTERNET COMPANY;
SOMALI NETWORK AB;
SOMALI INTERNATIONAL RELIEF ORGANIZATION (U.S.A.);
STERLING CHARITABLE GIFT;
STERLING MANAGEMENT GROUP, INC.;
SUCCESS FOUNDATION, INC.;
TABA INVESTMENTS;
TANZANITE KING;
ULEMA UNION OF AFGRAHNISTAN;
WADI AL AQIA;
WAFA HUMANITARIAN ORGANIZATION;
WORLD ASSEMBLY OF MUSLIM YOUTH,
a/k/a WAMY INTERNATIONAL, INC.;

WORLD ASSOCIATION FOR MUSLIM YOUTH;
WAMY INTERNATIONAL, INC.;
YORK FOUNDATION;
YOUSEF M. NADA & CO. GESELLSCHAFT M.B.H.
ABD AL-HADI AL-IRAQI;
ABD AL-MUSHIN AL-LIBI,
ABDUL RAHMAN KHALED BIN MAHFOUZ;
ABDUL RAHMAN YASIN;
AHMAD I. NASREDDIN;
AHMED NUR ALI JUMALE a/k/a AHMED NUR ALI JIM'ALE;
AL-GAMMAAH AL ISLAMIAH,
ALBERT FRIEDRICH ARMAND HUBER, a/k/a AHMED HUBER;
ALI GHALEB HIMMAT;
DAR AL MAAL AL ISLAMI;
ENAAM M. ARNANOUT;
MOHAMED S. OMEISH;
MOHAMED MANSOUR;
MOHAMMED SALIM BIN MAHFOUZ;
MUFTI MOHAMMED RASHID, a/k/a RASHID MUHAMMAD SALAH,
ABDURAHMAN ALAMOUDI;
KHALED NOUR;
SULAIMAN AL-ALI;
ABDULLAH M. AL-MAHDI;
TAREQ M. AL-SWAIDAN;
ABDUL AL-MOSLAH;
SALAH BADAHDH;
ABDULLAH BIN SALEH AL OBAID, a/k/a ABDULLA AL OBAID,
HASSAN A.A. BAHFZALLAH;
M. YAQUB MIRZA;
HASSAN A.A. BAHAFZALLAH;
YAQUB M. MIRZA;
JAMAL BARZINI;
ABU SULAYMAN;
AHMED TOTONJI;
HISHAM AL-TALIB;
IQBAL YUNUS;
JAMAL BARZINJI;
M. OMAR ASHRAF;
MOHAMMED JAGHLIT;
MUHAMMAD ASHRAF;
TAHA JABER AL-ALWANI;
TARIK HAMDI;
YAQUB MIRZA;
SHERIF SEDKY;
AQEEL ABDUL-AZEEL AL-AQEEL;
MANSOUR AL-KADI;

SOLIMAN H.S. AL-BUTHE;
PEROUZ SEDA GHATY;
SYED SULEMAN AHMER;
ENAAM MAHMOUD ARNAOUT a/k/a ABDEL SAMIA a/k/a ABU MAHMOUD;
MAZIN M.H. BAHARETH;
ZAHIR H. KAZMI;
MUZAFFAR KHAN;
SOLIMAN J. KHUDEIRA;
JAMAL NYRABEH;
ABDULLAH BIN LADEN;
IBRAHIM S. ABDULLAH;
MOHAMMAD BIN FARIS;
DR. MAHMOUD DAKHIL;
TARIK BIN LADEN;
KHALID BIN SALIM BIN MAHFOUZ, a/k/a KHALID BIN MAHFOUZ;
ABDULRAHMAN BIN;
SALEH ABDULLAH KAMEL;
MOHAMMED AL FAISAL AL SAUD;
TURKI AL FAISAL AL SAUD;
PRINCE NAYEF IBN ABDULAZIZ AL SAUD;
PRINCE SULTAN BIN ABDULAZIZ AL SAUD;
RAHIB HADDAH;
SAFIQ AYADI;
SHEIKH ABU BDUL AZIZ NAGI;
SHEIKH ADIL GALIL BATARGY, a/k/a ADEL ABDUL JAIIL BATTERJEE;
SHAHIR ABDULRAOOF BATTERJEE;
SULAIMAN BIN ABDUL AZIZ AL RAJHI; a/k/a SULEIMAN ABDEL AZIZ AL RAJHI;
SALEH ABDUL AZIZ AL RAJHI;
YOUSEF M. NADA;
YUSAF AHMED ALI;
ABDULLAH SULAIMAN AL-RAJHI;
KHALID SULAIMAN AL-RAJHI;
YASSIN ABDULLAH AL KADI;
MOHAMMAD JAMAL AL KHALIFA, a/k/a MOHAMMED JAMAL KHALIFA,
ADEL ABDUL JALIL BATTERJEE;
AQUEEL AL-AQUEEL;
ABDUL RAHMAN AL SWAILEM;
WA'EL HAMZA JALAIDAN;
ABDULLAH OMAR NASEEF;

**THE REPUBLIC OF SUDAN;**

Defendants. )
)

Plaintiffs, by their attorneys, Baumeister & Samuels, P.C., as and for their Complaint, hereby allege:

## JURISDICTION AND VENUE

1. Plaintiffs listed in the caption of this action are U.S. citizens or residents who are survivors, beneficiaries, heirs, distributees and/or next of kin as well either the Executors, Administrators or Personal Representatives of the Estates of persons killed in the September 11, 2001 terrorist attacks perpetrated by some of the defendants with the support and assistance of the other defendants, in which four United States' commercial aircraft were caused to crash into the World Trade Center Towers, the Pentagon, and a field in Shanksville, Pennsylvania (hereinafter the "September 11th Attacks"). Plaintiffs' decedents were passengers or crew members on board American Airlines Flights 11 and 77, United Airlines Flights 175 and 93, and persons present at both Towers of the World Trade Center in New York, or present at the Pentagon in Virginia.

2. Jurisdiction with respect to the defendants arises pursuant to 28 U.S.C. §1330(a)(actions against foreign states), 1331 (federal question), 1332(a)(2)(diversity of citizenship), 1350 ("Alien Tort Act"), 1605(a)(2), 1605(a)(5) and (a)(7) ("Foreign Sovereign Immunities Act"), and the Torture Victim Protection Act, PL 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (West 1993)).

3. Venue is proper in this district pursuant to the Air Transportation Safety and System Stabilization Act, (Pub. Law 107-42, 115 Stat. 230), 49 U.S.C. §40101, Title IV, § 408(b)(3), designating the United States District Court for the Southern District of New York as the exclusive venue for all civil actions brought as a result of, or relating to the September 11th Attacks, and 28 U.S.C. §1391(b)(2) and 1391(f)(1) because a substantial number of acts, occurrences, injuries and deaths occurred within the Southern District of New York.

4. As set forth herein, actions for wrongful death, trauma, loss of consortium, companionship, survival, and related torts perpetrated by foreign states, such as the Republics of Sudan and Iraq, through their agencies, instrumentalities, their officials, employees and/or agents alleged herein, fall within the exceptions to jurisdictional immunity under 28 U.S.C. §§ 1605(a)(5) and 1605(a)(7)(the "Foreign Sovereign Immunities Act").

**THE PARTIES**

**THE PLAINTIFFS**

5. Plaintiff, CHIEMI YORK, is the wife of the decedent, KEVIN PATRICK YORK, and has been appointed the Administratrix of her husband's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, KEVIN PATRICK YORK, and on behalf of any other individual entitled to recover under the applicable law.

6. Plaintiff, JENNIEFR TARANTINO, is the wife of the decedent, KENNETH TARANTINO, and has been appointed the Executrix of her husband's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, KENNETH TARANTINO, and on behalf of any other individual entitled to recover under the applicable law.

7. Plaintiff, H. MICHAEL KEDEN, is the Executor of the Estate of, ADAM JAY LEWIS. Plaintiff brings this action on behalf of PATRICIA LEWIS in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, ADAM JAY LEWIS, and on behalf of any other individual entitled to recover under the applicable law.

8. Plaintiff, NANCY ANN FOSTER, is the wife of the decedent, NOEL JOHN

FOSTER, and has been appointed the Administratrix of her husband's estate. Plaintiff brings this action on behalf of herself individually, as well as in a representative capacity on behalf of all potential heirs, survivors, next of kin and/or beneficiaries of the decedent, NOEL JOHN FOSTER, and on behalf of any other individual entitled to recover under the applicable law.

9. The plaintiffs identified above shall be collectively referred to as the "plaintiffs."

10. As a result of the terrorist attacks as described herein, the plaintiffs' decedents' were forced to endure severe mental anguish, fear of impending death, and ultimately suffered severe physical injuries which caused their deaths.

11. As a direct and proximate result of the foregoing, the heirs and distributees of each decedents' estate, represented by the individual plaintiffs identified above, individually, and in their capacity as Administrators, Executors, and/or Personal Representatives, were caused to sustain the loss of income, support, society, love, grief, consortium, services, guidance, care, comfort, companionship and inheritance of the decedents and suffered mental anguish and mental pain and suffering, and were caused to incur other necessary and reasonable expenses as a result of the decedents' deaths, including, but not limited to, funeral and burial costs, and were otherwise damaged.

12. As a direct and proximate result of the foregoing, the plaintiffs' decedents were caused to sustain severe and serious permanent injuries, grievous pain, agony and mental anguish, all prior to the decedents' death, with no negligence on the part of the decedent contributing thereto.

**THE DEFENDANTS**

13. Defendants are co-conspirators who intentionally, wilfully and knowingly conspired, planned, financed, supported, executed and carried out a plan to murder, maim and

injure United States' citizens, residents and others on September 11, 2001; and all participated directly or indirectly in the September 11th Attacks on the United States of America. Defendants fall into three primary categories, AL QAEDA and its members and associates, including Osama Bin Laden, IRAQ and SUDAN as State Sponsors of AL QAEDA's terrorist activities, and entities or individuals who provided financial or other support to the defendant AL QAEDA and its terrorist activities.

14. Defendant AL QAEDA, a/k/a Islamic Army, is an unincorporated association organized to perpetrate acts of international terrorism, including murder, mayhem, bombings and hijackings against the United States, its citizens and its allies. The defendant AL QAEDA has also encouraged, financed and supported other terrorist groups who targeted U.S. citizens. Defendant AL QAEDA, as of September 11, 2001, was headquartered in Afghanistan, but has a network of terrorist "cells" throughout the world.

15. Defendant OSAMA BIN LADEN a/k/a Usama Bin Laden, Abu Abdullah, Mujahid Shaykh Hajjs and Abdul Hay ("BIN LADEN") was formerly a national of Saudi Arabia with Yemen as his ancestral home, but who is now an alien of unknown nationality. He is last known to have been living in Afghanistan. Defendant BIN LADEN has headed and directed the terrorist activities of the defendant AL QAEDA.

16. Defendants BIN LADEN, MUHAMMAD ATEF, AYMAN AL ZAWAHIRI, ABU ZUBAYDH, SAIF AL ADEL, KHALID SHEIKH MOHAMMED, ABDULLAH AHMED ABDULLAH, ABU AL JAFAR AL-JAZIRI, ABU HAFS, a/k/a THE MAURITANIAN, ABU JAFFER AL-JAZIRI, ABU SALAH AL-YEMENI, MUHSIN MUSA MATWALLI ATWAY, ANAS AL LIBY, FAZUL ABDULLAH MOHAMMED, AHMED MOHAMED HAMED ALI, MOHAMED SULEIMAN AL NALFI, MUSTAFA MOHAMED FADHIL, AHMED

KHALFAN GHAILANI, FAHID MOHAMMED ALLY MSALAM, SHEIKH AHMED SALIM SWEDAN, MUHAMMAD, ABU-ISLAM, ABDULLAN QASSIM, RAMZI BIN AL-SHIBB, HASHIM ABDULRAHMAN, MUSTAFA AHMED AL-HAWSAWI, ABDULLAH AZZAM, JAMAL AL-BADAWI, MOHAMMED OMAR AL-HARAZI, WALID AL-SOUROURI, FATHA ADBUL RAHMAN, YASSER AL-AZZANI, JAMAL BAKHORSH, AHMAD AL-SHINNI, RAED HIJAZI, JAMIL QASIM SAEED, ABU ABDUL RAHMAN, MOHAMED BAYAZID, AL SHAYKF AL IRAQUI are or were natural persons who, on or before September 11, 2001, were leaders and/or members of AL QAEDA who conspired, acted in concert with, aided and abetted, sponsored and assisted directly and indirectly, in the September 11th Attacks against the United States of America.

17. Defendants MOHAMMED ATTA, MARWAN AL-SHEHHI, FAYEZ AHMED, AHMED AL GHAMDI, HAMZA AL GHAMDI, MOHALD AL SHEHRI, SATAM M. A. AL SUQAMI, ABDULAZIZ AL OMARI, WALEED M. AL SHEHRI, WAIL AL SHEHRI, KHALID AL MIDHAR, NAWAF AL HAZMI, HANI HANJOUR, SALEM AL HAZMI, and MAJED MOQED hijacked three commercial aircraft of September 11, 2001 and committed mass murder by deliberately flying the aircraft into the World Trade Center Towers and the Pentagon. Defendants ZIAD SAMIR JARRAH, AHMED IBRAHIM A. AL HAZNAWI, SAEED AL GHAMDI, and AHMED AL NAMI hijacked United Airlines Flight 93 which departed from Newark, New Jersey bound for San Francisco, California, and attempted to deliberately fly the aircraft into the White House or other prominent Washington, D.C. landmark, but were thwarted by the efforts of the heroic passengers, resulting in the aircraft crashing to the ground in Shanksville, Pennsylvania. The "twentieth hijacker", defendant ZACARIAS MOUSSAOUI, was in custody of U.S. government officials on September 11, 2001 and thus

unable to participate in the attacks perpetrated that day. Plaintiffs have named as defendants, the estates of various AL QAEDA members who were killed on September 11, 2001 or in armed conflict with allied forces since September 11, 2001.

18. The defendant TALIBAN, as of September 11, 2001, was an unincorporated association that served as the *de facto* government of Afghanistan from approximately 1996 until sometime after September 11, 2001. Defendant TALIBAN, as of September 11, 2001, was headquartered in Kandahar, Afghanistan and had declared itself to constitute the government of Afghanistan.

19. Defendant MUHAMMAD OMAR ("OMAR") founded the defendant TALIBAN in 1996. Since 1996, OMAR has been the leader of the defendant TALIBAN's six member ruling council and was responsible for the TALIBAN's financial activities. Defendant OMAR, individually and through the defendant TALIBAN organization that he controlled, supplied material and logistical support to defendants AL QAEDA and BIN LADEN in furtherance of their terrorist plans to attack the United States of America and murder U.S. citizens.

20. Defendants AL QAEDA and TALIBAN were closely linked. Defendants OMAR and the TALIBAN afforded BIN LADEN special status in Afghanistan; and defendant BIN LADEN was the *de facto* head of the defendant TALIBAN's intelligence and security. Defendant BIN LADEN acted on defendant OMAR's behalf, by providing soldiers to crush opposition to the defendant TALIBAN's ruthless rule inside Afghanistan. Defendant OMAR enabled defendant BIN LADEN to export terrorism to the United States by allowing him to construct and maintain camps in Afghanistan and train defendant AL QAEDA members and other terrorists from around the world in the deadly and depraved methods of committing acts of violence, murder, destruction and mayhem. The Defendant OMAR refused to turn over the

defendant BIN LADEN to the United States after the September 11th Attacks, and instead, continued to offer sanctuary to the defendant BIN LADEN and members of the defendant AL QAEDA.

21. The defendant REPUBLIC OF IRAQ ("IRAQ") is a foreign sovereign state within the meaning of 28 U.S.C. § 1391(f) located in the Middle East that shares borders with Saudi Arabia, Jordan, Syria, Turkey, Iran and Kuwait. The United States does not have formal diplomatic relations with the current government of the defendant IRAQ, which maintains an office in New York, the Permanent Representative of IRAQ to the United Nations at 14 East 79th Street, New York, New York 10021. The defendant IRAQ maintains an Interest Section in the Algerian Embassy in Washington, D.C. located at 1801 "P" Street, N.W., Washington, D.C. 20036.

22. The defendant IRAQ has for many years been designated by the Department of State as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j); the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b); and 28 U.S.C. §2333. The defendant IRAQ by and through its agents and instrumentalities has supported, encouraged, sponsored, aided and abetted and conspired with a variety of groups that use terror to pursue their goals. The defendant IRAQ has provided financing, training, safe-haven, and weapons for terrorist groups including the defendants AL QAEDA and BIN LADEN.

23. The defendant IRAQI INTELLIGENCE AGENCY ("IRAQI INTELLIGENCE"), a/k/a THE MUKHABARAT, a/k/a THE FEDAYEEN, a/k/a AL-QARE, a/k/a UNIT 999, a/k/a M-8 OPERATIONS, is the intelligence and operational entity in charge of conducting clandestine operations for the government of the defendant IRAQ, and is an agency, instrumentality and/or organ of the Iraqi government.

24. Defendants SADDAM HUSSEIN, QUSAY HUSSEIN, UDAY HUSSEIN, TAHA YASSIN RAMADAN, MUHAMMED MAHDI SALAH, FARUQ AL-HIJAZI, SALAH SULEIMAN, AHMED KHALIL IBRAHIM SAMIR AL-ANI HABIB FARRIS ABDULLAH AL-MAMOURI, and ABDEL HUSSEIN, a/k/a THE GHOST, HAQI ISMAIL, TAHA AL ALWANI ABU AGAB, and ABU WA'EL are natural persons, subjects and citizens of IRAQ and leaders, agents and/or employees of the defendant IRAQ and/or the defendant INTELLIGENCE AGENCY, who participated in the acts and conspiracy described below while acting in the course and scope of their employment.

25. The defendant REPUBLIC OF SUDAN ("SUDAN") is a foreign sovereign state within the meaning of 28 U.S.C. § 1391(f) located on the continent of Africa. The United States does not have formal diplomatic relations with the current government of the defendant SUDAN, which maintains an Embassy in Washington, D.C. located at 2210 Massachussets Avenue, N.W., Washington, D.C. 20008-2831.

26. The defendant SUDAN has for many years been designated by the Department of State as a foreign state that sponsors terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j); the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b); and 28 U.S.C. §2333. The defendant SUDAN by and through its agents and instrumentalities has supported, encouraged, sponsored, aided and abetted and conspired with a variety of groups that use terror to pursue their goals. The defendant SUDAN has provided financing, training, safe-haven, and weapons for terrorist groups including the defendants AL QAEDA and BIN LADEN.

27. The co-conspirator defendants are individuals, organizations, banks and charities located all over the world who conspired with the defendants AL QAEDA, BIN LADEN, IRAQ,

the TALIBAN, and SUDAN to raise, launder, transfer, distribute and hide funds for the defendants AL QAEDA and BIN LADEN in order to support and finance their terrorist activities, including, but not limited to, the September 11th Attacks. Some of the individuals, businesses, banks and charities operate legitimate businesses, but also maintain a dual role as co-conspirator with the defendant AL QAEDA and have actively supported its terrorist activities; while others, including some of the individuals, are a sham front for the defendant AL QAEDA or all full fledged members of the defendant AL QAEDA.

## SUMMARY OF ALLEGATIONS

28. The September 11th Attacks were the result of a world-wide terror conspiracy against the United States involving, among others, the defendants AL QAEDA, BIN LADEN, the TALIBAN, IRAQ and SUDAN, who have conspired for many years to attack the United States and murder its citizens. The defendants herein supported, conspired, aided and abetted, sponsored, planned and executed the September 11th Attacks that killed thousands of persons and injured many thousands more.

29. For many years, the defendants AL QAEDA, BIN LADEN and the TALIBAN wanted to drive the United States from the Arabian peninsula, topple Middle Eastern governments supported by the United States, including Egypt and Israel, and create an Islamic empire based upon its narrow interpretation of the Koran. Over the years, the defendant AL QAEDA has grown as it has absorbed or allied with other like-minded Islamic terrorist groups, including the defendant EGYPTIAN ISLAMIC JIHAD.

30. The defendant IRAQ has sworn revenge against the United States dating back to 1992 when the defendant IRAQ was soundly defeated in the Persian Gulf War. Since the defendant IRAQ could not defeat U.S. military forces, it resorted to terror attacks on U.S.

citizens. In order to avoid another confrontation with U.S. military forces, the defendant IRAQ contracted with or sponsored Islamic fundamentalists who were willing to commit terrorist acts on its behalf. Indeed, in 1993, agents of the defendant IRAQ tried to destroy the towers of the World Trade Center by planting a bomb in the parking garage of the World Trade Center.

31. During this time period, members of the defendant AL QAEDA established close working relations with agents of the defendant IRAQI INTELLIGENCE residing in the defendant IRAQ, Afghanistan, the defendant SUDAN and elsewhere. Soon thereafter, the defendant IRAQI INTELLIGENCE decided to support the defendant AL QAEDA and employ terrorists trained by the defendant AL QAEDA to carry out the defendant IRAQ's terror attacks. The relationship between the defendants IRAQ and AL QAEDA benefitted the defendant IRAQ because it provided the country with trained terrorists willing to die in terror attacks. As a secular state, the defendant IRAQ does not have a large number of citizens wishing to die as martyr warriors. Additionally, by utilizing suicide terrorists from the defendant AL QAEDA, the defendant IRAQ could disavow involvement in terrorist attacks and avoid retribution. The relationship benefitted the defendant AL QAEDA who, in exchange, it received the support, funding, facilities and training it needed to carry out its campaign of terror.

32. During the mid 1990s, the defendant IRAQ began actively supporting the operations of the defendant AL QAEDA by providing intelligence, training, weapons, supplies, passports, travel documents and financial support as a co-conspirator. Significantly, one of the defendant IRAQ's training camps contained the fuselage of a Boeing 707 used to train members of the defendant AL QAEDA in hijacking commercial aircraft.

33. The defendant SUDAN has also provided extensive support for the terrorist efforts of the defendants AL QAEDA and BIN LADEN. In or about 1991, the defendant

strengthens the legal rights of individual citizens to pursue justice and punishment against the perpetrators of terror. Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism, (The USA Patriot Act, Title X, 2001). The Patriot Act itself was the culmination of decades of precedent setting judicial decisions and statutory enactments that gave individuals enlarged rights to seek redress and compensation for damages from the sponsors of terrorism. When viewed as a whole, these executive, legislative and judicial actions vastly empower individual victims of terrorism to seek, win and enforce justice.

37. Plaintiffs herein, as the appointed and/or to be appointed Personal Representatives of the estates of those killed on September 11, 2001, assert federal common law and statutory claims as available, on behalf of all potential heirs, survivors, next of kin and beneficiaries, as well as on behalf of any individual entitled to recover under the applicable law. In addition to these causes of action, claims are brought pursuant to the Foreign Sovereign Immunities Act 28 U.S.C. § 1605(a)(2); § 1605(a)(5); and § 1605 (a)(7) with Pub. L. 104-208, Div. A. Title I, § 1605 note (West Supp.)(Flatow Amendment); Torture Victim Protection Act, Pub. La. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (West 1993); Alien Tort Claim Act, 28 U.S.C. § 1350; and the Anti Terrorism Claims Act, 18 U.S.C. § 2333, *et. seq.* [1]

---

[1]As set forth in the Air Transportation Safety and System Stabilization Act and the amendments to same contained in the Aviation Transportation Security Act, the instant complaint does not prevent any of the Plaintiffs identified herein from also seeking relief through the September 11th Victim Compensation Fund of 2001 (the "Fund"). This fact was further confirmed by the Special Master to the Fund, Kenneth Feinberg, Esq., when he publicly stated that Nations harboring terrorists, or promoting terrorism, can be sued by those participated in the Fund. The Department of Justice, Office of Attorney General has also reiterated victims' rights to pursue actions against terrorists: A claimant who files for compensation waives any right to file a civil action (or to be a party to an action) in any federal or state court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001, *except* for actions to recover collateral source obligations *or civil actions against any person who is a knowing participant in any conspiracy to hijack any aircraft or to commit any terrorist act.*

## DEFENDANTS AL QAEDA AND BIN LADEN

38. Upon information and belief, the defendant BIN LADEN went to Afghanistan just after the Soviet invasion in 1979. He became a prime financier, recruiter, and military leader of the Mujahedeen groups fighting against the Soviet forces, advertising all over the Arab world for young Muslims to come to Afghanistan to fight against the Soviets. As part of his actions, the defendant BIN LADEN set up recruiting offices all over the world, including in the United States and Europe. These recruiting offices were often funded through charitable organizations that received donations made by Islamic charities, wealthy Saudi families, mosques, legitimate businesses and criminal enterprises and others. These charities operated in the United States, Europe, Asia, Africa, and the Middle East and were to become an essential part of the support system used by the defendants BIN LADEN and AL QAEDA, providing them with the financial resources necessary to engage in acts of terrorism and war.

39. Monies were raised in part through a system of Islamic thinking known as zakat. Zakat, as one of the pillars of Islam, calls for faithful Muslims to give a specified percentage on certain properties to certain classes of needy people. Cash funds held in possession for one year require a two and a half percent zakat payment to a charity which manages the donations. The intended recipients of the zakat were soon perverted as a radical Islamic fundamentalist sect took hold and grew.

40. Born to a wealthy Saudi family, the defendant BIN LADEN paid for the transportation of the new recruits to Afghanistan with some of his personal fortune, and set up a number of terrorist training camps within the country. The Afghan government donated land and resources, while the defendant BIN LADEN brought experts from all over the world to the camps to train recruits on guerilla warfare, sabotage, and covert operations. Within a little over a

year, there were thousands of volunteers training in the defendant BIN LADEN's private military camps.

41. Under the leadership of the defendant BIN LADEN and the defendants MUHAMMAD ATEF ("ATEF"), a/k/a ABU HAFS AL MASRY, SHEIKH TAYSIR ABDULLAH, ABU FATIMA; ABU KHADIJA, together with Abu Ubaidah Al Banshiri (who died in 1996), AYMAN AL ZAWAHIRI and others, the "Mekhtab al Khidemat" or the "Azzam Service Center", the rudimentary organization initially established by the defendant BIN LADEN expanded, creating terrorist cells in various parts of the world, including Afghanistan, Pakistan and the United States.

42. The Azzam Service Center continued to grow over the next several years, financing and supporting other terrorist groups throughout the world committed to acts of violence, murder, destruction and mayhem. From approximately 1989 to the present, this violent international terrorist group has been known as "AL QAEDA", which translates from Arabic to mean "the Base" or "the Vanguard". One of the primary objectives of the defendant AL QAEDA is to oppose non-Islamic governments and to seeks to overthrow the governments of those Islamic states it considers too secular, or too beholden to the West.

43. At all relevant times, the defendant AL QAEDA was led by the defendant BIN LADEN. Members of the defendant AL QAEDA pledge an oath of allegiance (known as a "bayat") to both the defendants BIN LADEN and AL QAEDA, committing themselves to become martyrs in their depraved cause.

44. The defendant AL QAEDA actively and vehemently oppose the United States for several reasons. First, it regards the United States as a "kafir" or "infidel" nation governed in a manner inconsistent with the group's interpretation of Islam. Second, it believes the United

States provides essential support to other "infidel" nations and organizations, particularly the governments of Egypt, Israel and the United Nations, which are regarded by the defendant AL QAEDA as its enemies. Third, the defendant AL QAEDA opposed the involvement of the United States armed forces in the Gulf War in 1991 and its presence in the Middle East afterwards as illustrated by Operation Restore Hope in Somalia in 1992 and 1993. The defendant AL QAEDA viewed these as pre-textual preparations for an American occupation of Islamic countries. In particular, the defendant AL QAEDA opposed the continued presence of American military forces in Saudi Arabia and elsewhere on the Saudi Arabian peninsula following the Gulf War. Fourth, the defendant AL QAEDA opposed the United States government because of the arrest, conviction and imprisonment of members of the defendant AL QAEDA or other terrorists with whom it worked, including the Islamic Group's Sheik Omar Abdel Rahman, who was convicted of planning to bomb bridges and tunnels in New York City. Finally, the defendant AL QAEDA believes that the United Nations sanctions against the defendant IRAQ were orchestrated by the United States out of an "eagerness to destroy" the defendant IRAQ. The response of the defendant AL QAEDA was to issue fatwas (rulings on Islamic law) stating that attacks on the United States were both proper and necessary.

45. As early as 1991, the defendants BIN LADEN and AL QAEDA began working closely with the defendant AYMAN AL ZAWAHIRI ("ZAWAHIRI"), a/k/a ABDEL MUAZ, a/k/a DR. AYMAN AL ZAWAHIRI, a/k/a THE DOCTOR, a/k/a NUR, a/k/a USTAZ, a/k/a ABU MOHAMMED, a/k/a ABU MOHAMMED NUR AL-DEEN, whose organization, the defendant EGYPTIAN ISLAMIC JIHAD, shared the goals of the defendants BIN LADEN and AL QAEDA. The defendant EGYPTIAN ISLAMIC JIHAD is a group dedicated to the forceful overthrow of the Egyptian government and committing violence against the United States. The

defendant BIN LADEN had met the defendant ZAWAHIRI in Peshawar, Pakistan in 1987 during the Afghan-Soviet War.

46. Upon information and belief, by February 1998, the defendant EGYPTIAN ISLAMIC JIHAD lead by the defendant ZAWAHIRI had effectively merged with the defendant AL QAEDA and had joined its efforts to target violent acts against United States citizens.

47. Upon information and belief, the defendant AL QAEDA has a command and control structure which includes a "majalis al shura" (or "consultation council") that discusses and approves major undertakings, including terrorist operations. Defendants BIN LADEN, ATEF, ZAWAHIRI, SAIF AL ADEL ("SAIF AL ADEL"), MAMDOUH MAHMUD SALIM, a/k/a ABU HAJER" and ABDULLAH AHMED ABDULLAH, a/k/a ABU MOHAMED EL MASRY, a/k/a SALEH, among others, sat on the consultation council of the defendant AL QAEDA. Its affiliate, the defendant EGYPTIAN ISLAMIC JIHAD also had a founding council, on which the defendant IBRAHIM EIDAROUS sat.

48. Upon information and belief, the defendant AL QAEDA also maintains a "military committee" which considers and approves military matters. The defendant ATEF sat on the military committee and was one of the defendant BIN LADEN's two principal military commanders together with Abu Ubaidah al Banshiri, until his death in 1996. The defendant ATEF had the principal responsibility for supervising the training of members of the defendant AL QAEDA. The defendant SAIF AL ADEL also served on the military committee reporting to the defendant ATEF.

49. Upon information and belief, the defendant AL QAEDA functions both on its own and as a conduit for other terrorist organizations in other parts of the world that share its ideology, such as the defendant EGYPTIAN ISLAMIC JIHAD, the defendant AHMED REFAI

TAHA, a/k/a ABU YASSER AL MASRI, and a number of jihad terrorist groups in other countries, including those located in the defendant SUDAN, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Phillippines, Tajikistan, Azerbaijan, the Kashmiri region of India and the Chechnyan region of Russia. Training camps of the defendant AL QAEDA are used to train terrorists to right in Islamic causes, such as supporting Pakistan in its dispute with India over the province of Kashmir. The defendant AL QAEDA maintains terrorist cells and personnel in a number of countries to facilitate its activities, including Kenya, Germany, Tanzania, the United Kingdom, Canada and the United States.

50. Upon information and belief, the defendants BIN LADEN and AL QAEDA have also forged alliances with the National Islamic Front in the defendant SUDAN, and with representatives of the government of Iran, and its associated terrorist group, Hezbollah, for the purpose of working together against their perceived common enemies in the West, particularly the United States.

51. Upon information and belief, at various times from as early as 1989, the defendant BIN LADEN and others known and unknown, ran terrorist training camps and guesthouses in various areas, including Afghanistan, the defendant IRAQ, Iran, Pakistan, the defendant SUDAN, Somalia, Kenya, Malaysia, Phillippines and Germany for the use of members of the defendant AL QAEDA and its affiliated groups. The defendants MAMDOUH MAHMUD SALIM and ABU HAJER AL IRAQI, an Iraqi, managed some of these training camps and guesthouses in Afghanistan and Pakistan.

52. Upon information and belief, the defendant BIN LADEN was "expelled" from Saudi Arabia in 1991, and allegedly "disowned" by his own family for his extremist actions.

funding that it was receiving from the co-conspirator defendants named herein, members of the defendant AL QAEDA began staging international terrorist attacks. The first such attack was against the United Nations forces in Somalia on October 3 and 4 of 1993, in which 18 American servicemen were killed. Individuals who were members of the defendant AL QAEDA also plotted the first terrorist attacks against the World Trade Center in 1993, and a put together a plan in 1995 (code named "Project Bojinka") to blow up twelve American airliners simultaneously in the Pacific region. The backup plan for Project Bojinka was to hijack planes and use them as missiles against prominent American landmarks such as the World Trade Center, the White House, and the CIA headquarters in Langley, Virginia. Operatives of the defendant AL QAEDA were also involved in the bombing of the Khobar Towers in Riyadh, Saudi Arabia in which five American servicemen were killed in November 1995.

55. Upon information and belief, after the Khobar Towers attack in Saudi Arabia, a group of prominent Saudi individuals met in Paris where they agreed to "pay off" the defendants BIN LADEN and AL QAEDA to ensure that similar attacks would not occur within the borders of the Saudi Kingdom again. This protection money served to safeguard Saudi Arabia, but also enlarged the power of the defendants BIN LADEN and AL QAEDA.

56. Upon information and belief, in 1998, the defendants BIN LADEN and AL QAEDA orchestrated an attack on the United States embassies in the East African countries of Kenya and Tanzania. These explosions resulted in two-hundred ninety-one deaths and over five-thousand injuries. Thereafter, in October 2000, operatives of the defendant AL QAEDA committed yet another act of terrorism against the United States of America when they attacked the ship, the U.S.S. Cole in Yemen.

57. Upon information and belief, the attack on the U.S.S. Cole followed by the

atrocities committed on September 11, 2001 for which the defendants BIN LADEN and AL QAEDA have publicly and proudly proclaimed direct responsibility.

58. Although this complaint is brought under United States statutes, it is also based upon the common law and developing jurisprudence that provides that responsibility for terrorism lies not only with those who actually commit the act, but also with those who enabled or facilitated the terrorist attacks through financial backing.

59. Since 1989, the defendants BIN LADEN and AL QAEDA and many of their co-defendants named herein, have unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to murder and injure citizens of the United States in sites throughout the world, including the United States, and to conceal their activities and methods by, among other things, establishing front companies, providing false identify and travel documents, financing terrorist operations, engaging in coded correspondence, providing false information to the authorities in various countries and seeking to detect and kill informants.

**PREPARATION FOR THE SEPTEMBER 11TH ATTACKS**

60. Upon information and belief, according to foreign intelligence officials, in the spring of 2000, agents from the defendant IRAQI INTELLIGENCE met with defendant hijackers ZAID SAMIR JARRAH ("JARRAH") and MARWAN AL-SHEHHI ("AL-SHEHHI") in Dubai, U.A.E. in order advance the hijacking of U.S. aircraft to commit terrorist acts. Not long after the meeting, the defendant AL-SHEHHI entered the United States on May 29th and defendant JARRAH entered the United States on June 27th to begin preparations for the September 11th Attacks.

61. Upon information and belief, according to Czech intelligence sources, on June 2, 2000, the defendant MOHAMMAD ATTA ("ATTA"), a pilot and the operational leader of the

September 11th Attacks, traveled to Prague to meet other defendant co-conspirators. The following day, the defendant ATTA arrived at Newark International Airport in the United States.

62. Upon information and belief, according to the FBI, from July 2000 through March 2001, defendants ATTA, SHEHHI, HANJOUR, JARRAH and HAMZI traveled to the U.S. where they resided and took pilot courses to learn to fly Boeing 747, 757, 767 and Airbus A320 aircraft in furtherance of the defendant AL QAEDA conspiracy to hijack U.S. commercial aircraft to commit terrorist acts.

63. Upon information and belief, sometime between April 8th through April 11th 2001, the defendant ATTA left Florida where he was a flight student, to again meet in Prague with an agent of the defendant IRAQI INTELLIGENCE, defendant AL-ANI. Defendant ATTA returned to Florida and within two weeks opened a Sun County Bank account with $100,000 sent through a money changer in the UAE. Later in 2001, the defendant AL-ANI was expelled from the Czech Republic for espionage activities. Other intelligence reports indicate that the defendant AL-ANI met with the defendant KHALID AL MIDHAR ("MIDHAR"), another September 11th hijacker.

64. Upon information and belief, Italian security sources reported that the defendant IRAQ made use of its embassy in Rome to foster and cultivate the defendant IRAQ's partnership with defendants BIN LADEN and AL QAEDA. Defendant HABIB FARIS ABDULLAH AL-MAMOURI ("AL-MAMOURI"), a general in the Iraqi Secret Service, and a member of the defendant IRAQ's M-8 SPECIAL OPERATIONS branch, who was responsible for developing links with Islamist militants in Pakistan and Afghanistan, was stationed in Rome as an "instructor" for children of Iraqi diplomats. The defendant AL-MAMOURI met with September 11th pilot hijacker defendant ATTA in Rome, Hamburg and Prague. The defendant AL-

MAMOURI has not been seen in Rome since July 2001, shortly after he last met with the defendant ATTA.

65. Upon information and belief, on or about April 23, 2001, and on or about June 29, 2001, defendants SATAM AL SUQAMI (AA Flight 11), WALEED AL SHEHRI (AA Flight 11), AHMED AL-GHAMDI (UAL Flight 175), MAJED MOQED (AA Flight 77), AHEMD AL NAMI (UAL Flight 93), HAMZA AL GHAMDI (UAL Flight 175), MOHALD AL SHEHRI (UAL Flight 175), WAIL AL SHEHRI (AA Flight 11), AHMED AL HAZNAWI (UAL Flight 93), and FAYEZ AHMED (UAL Flight 175), traveled from various points in the world to the United States.

66. Upon information and belief, the FBI has reported that the defendant ATTA visited commercial crop dusting aircraft facilities in Florida in March and August 2001. In the wake of the September 11th Attacks, authorities concluded that the defendant ATTA was investigating the possibility of spraying chemical or biological weapons on U.S. civilians. In July and August 2001, on several occasions several other Middle Eastern men also visited the same crop dusting facility.

67. Upon information and belief, on July 7, 2001, two members of the IRAQ MUKHABARAT, defendants ABU AGAB and ABU WA'EL traveled together from Germany to Afghanistan and eventually to Kurdistan. The defendant ABU WA'EL trained at the defendant AL QAEDA terror camps and became the authority for fundamentalist groups operating in Kurdistan, intent on crushing opposition to defendant SADDAM HUSSEIN.

68. Upon information and belief, the FBI reported that on June 20, 2001, in furtherance of his participation in the hijacking conspiracy, the defendant ZACARIAS MOUSSAOUI ("MOUSSAOUI") purchased flight deck videos for Boeing 747 aircraft and took

a three day Boeing 747 simulator course in Minneapolis, Minnesota from August 13th through 15th, 2001. The defendant MOUSSAOUI also purchased two knives in Oklahoma City, Oklahoma on August 3, 2001. The defendant MOUSSAOUI received approximately $14,000 from the defendant RAMZI BIN AL-SHIBH sometime between August 1st through August 3, 2001.

69. Upon information and belief, U.S. government officials reported that in the summer of 2001, the defendants FAYEZ BANIHAMMAD (UAL Flight 175), SAEED ALGHAMDI (UAL Flight 93), SATAM AL SUQAMI (AA Flight 11), MOHALD AL SHEHRI (UAL Flight 175), AHMED AL GHAMDI (UAL Flight 93), and AHMED AL HAZNAWI (UAL Flight 93) each opened a Florida Sun Trust Bank account with a cash deposit. These and other bank accounts were used by the hijackers for living expenses, travel, pilot training, weapons and other incidentals and served as places where operatives acting on behalf of the defendant AL QAEDA could wire money to support the terrorist conspiracy in the months and weeks leading up to September 11, 2001.

70. Upon information and belief, on September 9, 2001, the defendants BIN LADEN and members of the defendant AL QAEDA, defendant OMAR and other members of the defendant TALIBAN carried out a plan to assassinate Ahmad Shah Masood, the military leader of the Afghanistan Northern Alliance opposition forces that had been fighting the defendant TALIBAN for many years. Defendant AL QAEDA terrorists posed as television journalists seeking an interview with Masood. The video camera was armed with explosives and when detonated at the purported interview, killed Ahmad Shah Masood, one of the suicide terrorists and other ranking members of the Afghanistan Northern Alliance opposition forces.

71. Upon information and belief, this assassination solidified the defendant BIN

LADEN's asylum and protection in the defendant TALIBAN controlled Afghanistan and cleared the way for the defendant AL QAEDA's unprecedented attack on the United States two days later. The defendant TALIBAN continued to refuse to surrender the defendant BIN LADEN and members of the defendant AL QAEDA to the United States after the September 11th Attacks.

**THE SEPTEMBER 11TH ATTACKS**

72. On September 11, 2001, defendants MOHAMMED ATTA, ABDUL ALZIZ AL OMARI, WAIL AL-SHEHRI, WALEED AL-SHEHRI and SATAM AL SUQAMI hijacked American Airlines Flight 11 carrying 92 persons, bound from Boston, Massachusetts to Los Angeles, California, and at approximately 8:46 A.M., crashed it into the North Tower, or Tower One, of the World Trade Center in New York, New York.

73. On September 11, 2001, defendants MARWAN AL-SHEHHI, FAYEZ AHMED, a/k/a BANIHAMMAD FAYEZ, AHMED AL-GHAMDI, HAMZA AL-GHAMDI, and MOHAUD AL-SHEHRI hijacked United Airlines Flight 175 carrying 65 persons, bound from Boston, Massachusetts to Los Angeles, California, and at approximately 9:02 A.M., crashed it into the South Tower, or Tower Two, of the World Trade Center in New York, New York.

74. On September 11, 2001, defendants KHALID AL-MIHDHAR, NAWAF AL-HAZMI, HANI HANJOUR, SALEM AL-HAZMI, and MAJED MOQED hijacked American Airlines Flight 77 carrying 64 persons, bound from Arlington, Virginia to Los Angeles, California, and at approximately 9:37 A.M. crashed it into the Pentagon in Arlington, Virginia.

75. On September 11, 2001, defendants ZIAD JARRAH, AHMED AL-HAZNAWI, SAEED AL-GHAMDI and AHMED AL-NAMI hijacked United Airlines Flight 93 carrying 45 persons, bound from Newark, New Jersey to San Francisco, California with the intention of crashing it into a target in Washington, D.C., probably the White House. At approximately

10:10 A.M., because of the heroic intervention of the United Flight 93's passengers, the aircraft crashed into a field in Shanksville, Pennsylvania.

76. As a result of the defendants deliberate acts intended to cause the deaths and serious injuries of thousands of innocent persons, at approximately 9:50 A.M., the South Tower of the World Trade Center collapsed, and at approximately 10:29 A.M., the North Tower of the World Trade Center collapsed.

77. The hijackings referenced herein were the culmination of a conspiracy among the defendants to attack the United States and murder United States citizens.

**THE IRAQI AND SUDAN DEFENDANTS**

78. Upon information and belief, since the early 1990s, the defendants IRAQ and IRAQI INTELLIGENCE have used both Iraqi agents and independent "contractors" to commit terrorist acts against the United States in revenge for Iraq's Gulf War defeat.

79. Upon information and belief, there have been numerous meetings between agents of the defendant IRAQI INTELLIGENCE and high ranking terrorists from the defendant AL QAEDA group to plan, strategize and coordinate terror attacks. One such meeting occurred in 1992, when defendant ZAWAHIRI, a leader of the defendant EGYPTIAN ISLAMIC JIHAD and officer of the defendant AL QAEDA met with agents of the defendant IRAQI INTELLIGENCE in Baghdad, Iraq over several days. An Iraqi serving with the defendant TALIBAN who fled Afghanistan in the fall of 2001 and was later captured, has corroborated this meeting and confirmed that contacts between agents and operatives of the defendant IRAQ began in 1992.

80. Upon information and belief, as referred to herein, in 1991, the defendant BIN LADEN left Saudi Arabia and relocated in the defendant SUDAN. He centered his operations for the defendant AL QAEDA there for the next several years while maintaining offices and

orchestrating terrorist recruitment, training and attacks in various parts of the world. The defendant BIN LADEN recruited new members in the defendant SUDAN, including defendant MOHAMED SULEIMAN AL NALFI and at least 200 Afghan Arabs, Saudis, Yemenis and Egyptians who had fought against the Soviets in Afghanistan and who became part of the defendant AL QAEDA's cell in the defendant SUDAN. Defendant ABU HAJER AL-IRAQI, a/k/a MAMDOUH MAHMUD SALIM, an Iraqi, served as the defendant BIN LADEN's top lieutenant in the defendant SUDAN shortly after the defendant BIN LADEN's arrival in the country.

81. Upon information and belief, while the defendant AL QAEDA's presence was growing in the defendant SUDAN in 1992, the government of the defendant IRAQ was also developing close ties with the government of the defendant SUDAN. The defendant SUDAN supported the defendant IRAQ during the Gulf War and allowed the defendant IRAQ to establish a center for the defendant IRAQI INTELLIGENCE in the defendant SUDAN through the defendant IRAQ's ambassador to Khartoum, the defendant ABD AL SAMAD AL-TA'ISH ("TA'ISH"). The defendant TA'ISH was a highly placed agent of the defendant IRAQI INTELLIGENCE who brought 35 other intelligence officers with him to the defendant SUDAN to establish a base for operations. The defendant TA'ISH remained in the defendant SUDAN through the summer of 1998. The defendant IRAQ arranged to smuggle scud missiles, chemical weapons and uranium into the defendant SUDAN using diplomatic mail privileges and other means. The defendant SUDAN agreed to store this material for the defendant IRAQ for safekeeping after the Gulf War to help circumvent U.S. weapons inspections.

82. Upon information and belief, during the early 1990s, defendant SHEIKH HASSAN AL-TOURABI of the Islamic National Front arranged meetings between the

defendants BIN LADEN and IRAQI INTELLIGENCE. The defendant BIN LADEN met with defendant FARUQ AL-HIJAZI, an agent of the defendant IRAQI INTELLIGENCE in the defendant SUDAN who would later head the defendant IRAQI INTELLIGENCE for the defendant SADDAM HUSSEIN. The defendant BIN LADEN met again with agents for the defendant IRAQI INTELLIGENCE in 1994 and 1995 in the defendant SUDAN. At these meetings, the defendant BIN LADEN and defendant IRAQI INTELLIGENCE secret service director defendant FARUQ AL-HIJAZI agreed to work together on terrorist projects directed against the United States.

83. Upon information and belief, in 1996, the defendant BIN LADEN returned to Afghanistan after the defendant TALIBAN seized control of most of that country. The number of defendant AL QAEDA members and terrorist training camps in Afghanistan grew rapidly following the defendant BIN LADEN's return. The defendant AL QAEDA actively supported the defendant TALIBAN and violently suppressed all opposition to the defendant TALIBAN.

84. Upon information and belief, from 1996 until 2001, the defendant BIN LADEN with the financial and logistical support of the defendant OMAR and others in the defendants TALIBAN, IRAQ AND IRAQI INTELLIGENCE created, supplied and operated at least five training camps in order to create an "Islamic Foreign Legion" capable of attacking their enemies throughout the world. These camps trained men from 15 nations in guerrilla warfare, terrorist activities, rocket warfare, demolition and bombing, including the use of mines, grenades, TNT, nitroglycerine and plastic explosives.

85. Upon information and belief, on August 23, 1996, a strengthened defendant BIN LADEN issued another fatwa declaring a jihad against Americans present in Muslim lands. The message was disseminated throughout all of the cells of the defendant AL QAEDA and

associated terrorists groups, including the defendant EGYPTIAN ISLAMIC JIHAD. The London, England cell of the defendant AL QAEDA, run by the defendant KHALID AL FAWWAZ under the name "Advice and Reformation Committee", and the Egyptian cell, run by the defendants ZAWAHIRI and ABDEL BARRY, were used to send the fatwa to Muslims living in the Western world. The defendant WADIH EL HAGE was also used by the defendant BIN LADEN to deliver messages, money and terrorist materials to defendant AL QAEDA operatives located in the United States and United Kingdom.

86. Upon information and belief, in February 1997, the defendant BIN LADEN publicly expressed his support for the defendant IRAQ in its conflict with the United States by stating:

> "The hearts of the Muslims are filled with hatred towards the United States of America and the American president for American conduct towards IRAQ"

87. Upon information and belief, having decided to carry out acts of terrorism, the defendant SADDAM HUSSEIN, with the advice and prompting of his son and officer of the defendant IRAQI INTELLIGENCE, QUSAY HUSSEIN and his other son, UDAY HUSSEIN, head of a subdivision of the defendant IRAQI INTELLIGENCE known as the "Fedayeen" and "Al-Qare", concluded that a campaign of terrorist attacks against the United States under the banner of the defendants BIN LADEN and AL QAEDA was the most effective means of both deflecting U.S. attempts to topple his regime and obtaining revenge.

88. Upon information and belief, the defendant IRAQ agreed to supply arms to the defendant AL QAEDA and to provide said defendant with access to and training in the use of

chemical and biological weapons and agreed to instruct trainers of the defendant AL QAEDA at its Salman Pak camp in Baghdad which contained a Boeing 707 used to practice hijacking. The defendant IRAQ also agreed to supply terrorists from the defendant AL QAEDA with new identities and passports from Yemen and the United Arab Emirates.

89. Upon information and belief, the defendant AL QAEDA agreed to provide protection from political opponents to the defendants IRAQ and SADDAM HUSSEIN, and to commit assassinations and other acts of violence to create instability in regions of the defendant IRAQ, particularly Kurdistan, to assist the regime of defendant SADDAM HUSSEIN. The defendant AL QAEDA further agreed to provide trained errorists, assassins and martyrs to carry out terror attacks in concert with the defendant IRAQ against their common enemies, including the United States.

90. Upon information and belief, on February 22, 1998, the defendants BIN LADEN, FAWWAZ and ZAWAHIRI of the defendant EGYPTIAN ISLAMIC JIHAD issued a fatwa published in the Arabic newspaper *Al-Quds* stating:

> "The ruling to kill the Americans and their allies - civilian and military - is an individual duty for every Muslim who can do it in any country in which it is possible to do it . . . ".

91. Upon information and belief, additional fatwas of a similar nature were issued in May 1998 and published in *Al-Quids* under the banner of ULEMA UNION OF AFGHANISTAN.

92. Upon information and belief, between April 25th and May 1, 1998, two of the defendant BIN LADEN's senior military commanders, defendants MUHAMMAD ABU-ISLAM and ABDULLAH QASSIM, visited Baghdad for discussions with the defendant SADDAM HUSSEIN's son, defendant QUSAY HUSSEIN, the "czar" of the defendant IRAQI

INTELLIGENCE.

93. Upon information and belief, participation by the defendant QUSAY HUSSEIN in the aforementioned meetings highlights the importance of the talks in both symbolic and practical terms. As a direct result of these meetings, the defendant IRAQ again made commitments to provide training, intelligence, clandestine Saudi border crossing, financial support and weapons and explosives to the defendant AL QAEDA.

94. Upon information and belief, officials of the defendant IRAQ INTELLIGENCE met with the defendant BIN LADEN in Afghanistan several more times. A second group of operatives of the defendants BIN LADEN and AL QAEDA from Saudi Arabia were trained by the defendant IRAQI INTELLIGENCE in the defendant IRAQ to smuggle weapons and explosives into Saudi Arabia and other countries, which they later accomplished in an effort to carry out future terrorist acts of violence. A third group of operatives of the defendants BIN LADEN and AL QAEDA received a month of sophisticated guerrilla operations training from officials of the defendant IRAQI INTELLIGENCE later in the summer of 1998.

95. Upon information and belief, the defendant BIN LADEN continually sought to strengthen and reinforce the support he and the defendant AL QAEDA received from the defendant IRAQ. In July 1998, the defendant BIN LADEN sent the defendant ZAWAHIRI to the defendant IRAQ to meet with senior officials, including Iraqi vice-president defendant TAHA YASSIN RAMADAN. The purpose of this meeting was to discuss and plan a joint strategy for a terrorist campaign against the United States.

96. Upon information and belief, officials of the defendant IRAQI INTELLIGENCE pledged the defendant IRAQ's full support and cooperation on the condition that the defendants BIN LADEN and AL QAEDA promised not to incite groups inside the defendant IRAQ opposed

to the regime of the dictator defendant SADDAM HUSSEIN.

97. Upon information and belief, during the July 1998 visit, the defendant ZAWAHIRI toured a military base and nuclear and chemical weapons facility located in the defendant IRAQ and observed training by officials of the defendant IRAQI INTELLIGENCE at the al-Nasiriyah military and chemical weapons facility in the defendant IRAQ.

98. Upon information and belief, to demonstrate its commitment to the defendant IRAQ and its anti-U.S. policies, in the spring of 1998, the defendant AL QAEDA planned terrorist bombing attacks on the U.S. Embassies in Nairobi, Kenya and Dar Es Salaam, Tanzania. Defendants FAZUL ABDULLAH MOHAMED, KHALFAN KHAMIS, MOHAMED, MUSTAFA MOHAMED FADHIL, MOHAMED RASHED DAOUD AL'OWALI, SHEIKH AHMED SALIM SWEDAN, FAHID MOHAMED ALLY MSALAM and an individual known as ABDULLAH AZZAM were chosen as some of the terrorists of the defendant AL QAEDA who would conduct the coordinated attacks in Nairobi and Dar Es Salaam.

99. Upon information and belief, on August 7, 1998, at approximately 10:30 A.M., the defendants FAZUL, ABDULLAH MOHAMED, MOHAMED RASHED DAOUD AL'OWALI and ABDULLAH AZZAM drove a Toyota Dyna truck to the U.S. Embassy in Nairobi, Kenya and detonated a large bomb damaging the Embassy and demolishing a nearby Secretarial College building and Cooperative Bank building, resulting in more than 200 deaths, including 12 Americans, and injuries to more than 4,500 people.

100. Upon information and belief, on the same day, approximately ten minutes after the bombing in Kenya, at 10:40 A.M., defendants KHALFAN KHAMIS MOHAMED and AHMED the German detonated the Dar Es Salaam bomb in the vicinity of the U.S. Embassy in Dar Es Salaam, Tanzania, severely damaging the building, and killing 11 people and injuring